IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION
CASE NO. 5:12-cv-00188-RLV-DSC

| | |
|---|---|
| ALEX LEE, INC., | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| v. | ) **ORDER** |
| | ) |
| PERFORMANCE FOOD GROUP, INC., | ) |
| | ) |
| Respondent. | ) |

**THIS MATTER** is before the Court on Respondent Performance Food Group, Inc.'s Objections to the Magistrate Judge's April 1, 2013, Memorandum and Order, which stayed this matter pending the outcome of the parties' arbitration proceeding. (Doc. 21.)

This case arises from a stock-purchase agreement between the parties pursuant to which Petitioner agreed to sell all of the issued and outstanding stock in its subsidiary Institution Food House, Inc. The parties agreed to a base purchase price of $182,300,000, and the transaction was closed on June 23, 2012.[1] The parties further agreed that the "cash payment" would be adjusted by the addition and subtraction of defined assets and liabilities of Institution Food House, and that such adjustments would be determined within sixty days of the closing.[2] (Doc. 1-1 at 8, 17–20.) If the adjusted cash payment were to exceed the estimated cash payment, Respondent would

---

[1] Pursuant to section 2.3 of the stock-purchase agreement, Petitioner delivered to Respondent before the closing date a signed certificate setting forth the estimated cash payment. In light of the base purchase price and Petitioner's best estimate of indebtedness, which amounted to $68,568,726.51, the estimated cash payment was $113,731,273.49. (Doc. 1-3 at 2.) At the closing, Respondent wire-transferred directly to Petitioner $172,300,000—the entire base purchase price less $10,000,000 previously placed in escrow for the benefit of Petitioner. (Doc. 9 at 13; Doc. 15 at 5.)

[2] As reflected in the body of case law discussed by the parties, adjustment procedures of this sort are relatively common in stock-purchase agreements in part because some of the valuation considerations are constantly changing and, therefore, need to be estimated for purposes of the closing, subject to later adjustment based on a number of factors. Such factors here included the subsidiary's indebtedness, capital lease obligations, transaction expenses, and working capital. (Doc. 1-1 at 19.)

1

pay to Petitioner the difference; conversely, if the estimated cash payment were higher, Petitioner would pay to Respondent the difference. (Doc. 1-1 at 18.)

With respect to these adjustments, the parties have agreed as to the differences between the target net working capital and the net working capital as of the closing date, and between the estimated indebtedness amount and the actual indebtedness amount. (Docs. 1-4, 1-5.) However, the parties dispute the effect of Petitioner's overestimation of indebtedness. Where Petitioner insists that the final cash payment is to incorporate the indebtedness differential, requiring of Respondent an adjustment payment in the amount of $4,244,735.80, Respondent claims that the indebtedness differential should serve to offset its $3,012,643.74 overpayment of indebtedness at closing, requiring an adjustment payment of only $1,232,092.06, which it has made.

At issue here, however, is to what extent this dispute is to be subjected to arbitration. The agreement provides that in the event Petitioner objects to Respondent's calculation of the adjusted payment and the parties are themselves unable to resolve the dispute, the matter is to be submitted to an independent auditor for a "final and binding" determination. The relevant provision reads as follows:

> If the Closing Statement Recipient has any objections to the Closing Statement, then the Closing Statement Recipient will deliver a written statement (the "Objections Statement") describing (i) which items on the Closing Statement have not been prepared in accordance with this Agreement, (ii) the basis for such Person's disagreement with the calculation of such items and (iii) such Person's proposed dollar amount for each item in dispute, to the Closing Statement Preparer within 30 days after receipt by the Closing Statement Recipient of the Closing Statement. . . . If the Closing Statement Recipient fails to deliver an Objections Statement within such 30 day period, then the Closing Statement shall become final and binding on all Parties. . . . If the Closing Statement Recipient delivers an Objections Statement within such 30 day period, then the Seller and the Buyer will use commercially reasonable efforts to resolve any such disputes, but, if a final resolution is not obtained within 30 days after the Closing Statement Recipient has submitted the Objections Statement, any remaining matters that are in dispute will be resolved by the Independent Auditor. The Independent Auditor will prepare and deliver a written report to the Buyer and the Seller and will

2

> submit a proposed resolution of such unresolved disputes promptly, but in any event within 30 days after the dispute is submitted to the Independent Auditor. . . . The Independent Auditor's determination of such unresolved disputes will be final and binding upon all parties; provided, however, that no such determination shall be any more favorable to the Closing Statement Preparer than is set forth in the Closing Statement or any more favorable to the Closing Statement Recipient than is proposed in the Objections Statement.

(Doc. 1-1 at 19–20.) Respondent asserts, however, that its entitlement to offset arises without the scope of this provision, and thus the parties' dispute must be resolved by this Court in the context of Respondent's non-arbitrable counterclaims. (Doc. 9 at 4.)

Within his Memorandum and Order, the Magistrate Judge disagreed, concluding that "all of the disputes between [the parties] are within the scope of the arbitration clause." (Doc. 20 at 7.) While Respondent begrudgingly "accepts . . . this conclusion for the *contractual* disputes between the parties," it argues the Magistrate Judge erred in including extra-contractual claims and setoff rights within the clause's reach. (Doc. 21 at 2.) Because the parties have agreed as to the net amount of the post-closing adjustment to the cash payment as required by section 2.5 of the stock-purchase agreement, Respondent argues, there is no dispute arising under section 2.5 or, by extension, its arbitration provision. Respondent would read this arbitration provision as applying only to disputes regarding the accounting calculations in the closing statement and would have the Court consider the $3,012,643.74 offset as "wholly independent of the post-closing adjustment" because its legal right to offset its overpayment of indebtedness, rooted in theories of unjust enrichment, quantum meruit, basic principles of debtor–creditor law, and the doctrine of setoff and recoupment, arises independent of section 2.5 of the contract. (Doc. 18 at 6; Doc. 21 at 2.)

Under the Federal Arbitration Act ("FAA"),

> [a] written provision in any . . . contract evidencing a transaction involving commerce to settle by arbitration a controversy arising out of such contract or

3

transaction, or the refusal to perform the whole or any part thereof, . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2. The FAA "embodies a federal policy favoring arbitration" of disputes. *Drews Distrib., Inc. v. Silicon Gaming, Inc.*, 245 F.3d 347, 349 (4th Cir. 2001). Thus, "as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, [460 U.S. 1, 24–25] (1983).

> Of course, whether a party has agreed to arbitration is a matter of contract interpretation and "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582 (1960)). However "the heavy presumption of arbitrability requires that when the scope of the arbitration clause is open to question, a court must decide the question in favor of arbitration." *Peoples Sec. Life Ins. Co. v. Monumental Life Ins. Co.*, 867 F.2d 809, 812 (4th Cir. 1989). A court should not deny a request to arbitrate an issue "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *Warrior & Gulf Navigation Co.*, [363 U.S. at 582–83].

*Drews Distrib.*, 245 F.3d at 349–50.

The arbitration provision here is not a "broad" one. *Cf. Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 398 (1967) (recognizing as "broad" a clause requiring arbitration of "[a]ny controversy or claim arising out of or relating to" the agreement); *Drews Distrib.*, 245 F.3d at 350 (same). Rather, only those "objections to the [c]losing [s]tatement" that remain unresolved by the parties are to be referred for arbitration. (Doc. 1-1 at 19–20.) However, in seeking to recoup its indebtedness overpayment via offset, Respondent affected a change in the "cash payment" value within its closing statement. (Doc. 1-4 at 2–3.) Indeed, "closing statement" is defined to include this value, among others, rendering a dispute over such value to

be within the scope of the arbitration provision.[3] Petitioner timely objected to this closing statement, establishing its disagreement with Respondent's calculation of the final cash payment. The parties having failed to resolve their dispute regarding the cash-payment figure, such dispute, per the terms of the agreement, is to be resolved by the independent auditor. Therefore, Respondent's counterclaims, each regarding the propriety of its setoff in calculating the final cash payment—a term within its closing statement to which Petitioner has properly objected—are subject to arbitration; the Magistrate Judge's Order was neither clearly erroneous nor contrary to law.

**IT IS, THEREFORE, ORDERED** that Respondent's Objections to the Magistrate Judge's April 1, 2013, Memorandum and Order (Doc. 21) be **OVERRULED**. The Magistrate Judge's Order is hereby **AFFIRMED**.

Signed: July 9, 2013

Richard L. Voorhees
United States District Judge

---

[3] The "Closing Statement" is defined as "a statement setting forth the [preparer]'s calculation of the Net Working Capital as of the Closing Date, the Indebtedness Amount, the Capital Lease Obligations, the Transaction Expenses Amount and the Cash Payment . . . ." (Doc. 1-1 at 19.)

5